FILED

2024 Jan-31  PM 02:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

ADAM MELTON,                     )
                                 )
    Plaintiff,                   )
                                 )
v.                               )        Case No. 2:22-cv-00411-NAD
                                 )
CITY OF ROANOKE, et al.,         )
                                 )
    Defendants.                  )

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

For the reasons stated below and on the record in the motion hearing, the court **GRANTS** Defendant City of Roanoke's motion for summary judgment (Doc. 22). The City is entitled to judgment as a matter of law because there is no genuine dispute of material fact for trial with respect to causation on Plaintiff Adam Melton's Title VII retaliation claim.   Separately, the court will enter final judgment.

## BACKGROUND

Plaintiff Melton was the Chief of Police for the City of Roanoke from 2004 until 2020, when Defendant Jill Patterson Hicks was elected Mayor of Roanoke and selected someone else to replace Melton as police chief.   Patterson Hicks ran for mayor in part because of the community controversy that resulted after another member of the Roanoke Police Department—Lieutenant Derek Farr—had posted an allegedly racist message on his personal Facebook account.   Patterson Hicks and

Farr were friends, and Melton had recommended that the former mayor discipline Farr on account of the Facebook post.

### A.    Procedural background

Melton initiated this action, alleging two claims for relief:   (1) a retaliation claim against Defendant Patterson Hicks (the Mayor of Roanoke), in her individual capacity, pursuant to 42 U.S.C. § 1981; and (2) a Title VII retaliation claim against the City of Roanoke (Melton's former employer), pursuant to 42 U.S.C. § 2000e-3(a).   Doc. 1 at 1, 15–20.   The parties consented to magistrate judge jurisdiction. Doc. 10; 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; N.D. Ala. Local Rule 72.2.

After the close of discovery, Defendant Mayor Patterson Hicks filed a motion for judgment on the pleadings.   Doc. 19.   Melton filed a response, "consent[ing] to the dismissal of his claim under 42 U.S.C. § 1981 against Defendant Mayor Patterson" Hicks.   Doc. 21.   Consequently, the court granted that motion, and dismissed Melton's § 1981 claim against Patterson Hicks.   Doc. 25.

Melton's Title VII retaliation claim against the City remained pending.

The City then filed this summary judgment motion (Doc. 22), with a supporting brief (Doc. 24), and evidentiary material (Doc. 23).   The parties fully briefed the summary judgment motion.   Doc. 26 (Melton's evidentiary material); Doc. 27 (Melton's opposition); Doc. 28 (City's reply).   And the court held a motion hearing.   *See* minute entry, entered: 08/16/2023; Doc. 29 (order setting hearing).

After the motion hearing, the parties submitted supplemental briefing on the causation issue of Mayor Patterson Hicks' knowledge of Melton's alleged protected activity.   Doc. 30 (Melton's supplemental brief); Doc. 31 (City's supplemental brief); Doc. 32 (order on supplemental briefing).

## B.    Legal background

Title VII's anti-retaliation provision prohibits an employer from retaliating against an employee "because [the employee] has opposed any practice made an unlawful employment practice" by Title VII.   42 U.S.C. § 2000e-3(a); *see Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020).[1]   With respect to this "opposition" clause, the term "oppose" carries its ordinary meaning. *Crawford v. Metropolitan Gov. of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 276 (2009).

A plaintiff can prove a Title VII retaliation claim with direct or circumstantial evidence.   *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016);

---

[1] This provision is known as the "opposition" clause.  While § 2000e-3(a) also includes a "participation" clause, Melton's retaliation claim in this case arises only from the "opposition" clause quoted above in text.  *See, e.g.*, Doc. 27 at 17–18 (arguing that Melton "engaged in protected opposition activity," and discussing the opposition clause); Doc. 24 at 14–15 n.4 (City's argument that the complaint "does not appear to allege any claims of retaliation under the participation clause"); *see also* 42 U.S.C. § 2000e-3(a) (prohibiting an employer from retaliating against an employee "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII (participation clause)).

*Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008).

"Direct evidence is evidence that, if believed, proves the existence of discriminatory intent without inference or presumption." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (cleaned up). "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Todd v. Fayette Cty. Sch. Dist.*, 998 F.3d 1203, 1215 (11th Cir. 2021) (citing *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1156 (11th Cir. 2020)). For example, a decision-maker's statement that he planned to terminate an employee because the employee's deposition was the "most damning to the company" would be direct evidence of retaliatory intent. *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1182 (11th Cir. 1997).

"In contrast, circumstantial evidence only 'suggests—but does not prove—a discriminatory motive.'" *Jefferson*, 891 F.3d at 921 (quoting *Burrell v. Board of Trs.*, 125 F.3d 1390, 1393 (11th Cir. 1997)).

Where a plaintiff bases his retaliation claim on circumstantial evidence, the Eleventh Circuit "has primarily relied on the *McDonnell Douglas* framework to evaluate circumstantial-evidence-based employment claims at summary judgment." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1337 (11th Cir. 2023) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)) (other citations and

quotation marks omitted). "Under that familiar framework, a plaintiff must first make out a prima facie case by showing (1) she engaged in a statutorily protected activity, (2) she experienced an adverse employment action, and (3) causation." *Id.* (citation omitted).

However, just last month (in December 2023), the Eleventh Circuit explained what the *McDonnell Douglas* framework is and what it is not: "Properly understood, *McDonnell Douglas* is an evidentiary framework that shifts the burden of production between the parties to figure out if the true reason for an adverse employment action was [discrimination]. It is not a set of elements that the employee must prove—either to survive summary judgment or prevail at trial." *Tynes v. Florida Dep't of Juv. Just.*, 88 F.4th 939, 941 (11th Cir. 2023).

In *Tynes*, the Eleventh Circuit reiterated that the *McDonnell Douglas* framework "is 'only one method by which the plaintiff can prove discrimination by circumstantial evidence.' A plaintiff who cannot satisfy this framework may still be able to prove her case with what [the Eleventh Circuit] ha[s] sometimes called a 'convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" 88 F.4th at 946 (quoting *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 768 n.3 (11th Cir. 2005)) (other citations omitted). Accordingly, "in deciding motions for summary judgment," the court "look[s] beyond the prima facie case to consider all relevant evidence in the record

to decide the ultimate question of intentional discrimination." *Tynes*, 88 F4th at 947.

But, regardless what *Tynes* may have said about a Title VII claim based on circumstantial evidence, *Tynes* did not disturb or even discuss the causation standard for a Title VII retaliation claim.   *See* 88 F.4th at 943 ("A § 1981 claim differs in two relevant ways from a Title VII claim—there is no cap on damages and the causation standards are higher."); *see also id.* at 942 (similar); *infra* Legal Standard, B.

Thus, even on the convincing mosaic approach, "[a]t the end of the day, a retaliation plaintiff's 'mosaic' of evidence must still be enough to allow a reasonable jury to infer but-for causation."   *Yelling*, 82 F.4th at 1342 (citation omitted); *see also Reeves v. Columbus Consol. Gov't*, 2024 U.S. App. LEXIS 116, at *5 (11th Cir. Jan. 3, 2024) (similar). "While the 'convincing mosaic' approach is more flexible than the *McDonnell Douglas* framework, it is not a separate legal test. . . . The 'convincing mosaic' framework is rather a recognition 'that courts must consider the totality of a plaintiff's circumstantial evidence' before granting summary judgment." *Reeves*, 2024 U.S. App. LEXIS 116, at *5 (quoting *Yelling*, 82 F.4th at 1342).

### C.    Factual background

The following facts are undisputed, with all evidence and reasonable inferences construed in Melton's favor:

Melton began working for the Roanoke Police Department in 1989, and was first appointed as Chief of Police in 2004; Melton is a white male.   Doc. 24 at 5–6;

Doc. 27 at 7; Doc. 23-1 at 3.   Melton remained Chief of Police until 2020.   Doc. 24 at 5; Doc. 27 at 7; Doc. 23-1 at 3.

In May 2020, Derek Farr was a Roanoke police officer reporting to Melton; Farr is a white male.   Doc. 27 at 7; Doc. 24 at 6.   On May 30, 2020, Farr posted a message on his personal Facebook account commenting on protests related to the death of George Floyd.   Doc. 24 at 6; Doc. 27 at 7; Doc. 23-14.   The post stated: "Protesting?   Yea right!   More like thugs being thugs.   It['s] kind of hard to get people to believe that you're living in fear.   Just saying . . ."   Doc. 24 at 6; Doc. 27 at 8; Doc. 23-14.

Melton learned of Farr's post when Roanoke City Council member Mack Bell texted Melton a screenshot of Farr's post.   Doc. 24 at 6; Doc. 27 at 8; Doc. 23-4 at 5.

Melton testified in his deposition that "there was a stack of complaints about what he said [i.e., Farr's Facebook post] from the public that was probably that high (indicating)," and that Farr's Facebook post "was taken by multiple members of the community as being racist."   Doc. 23-1 at 18–19 (Melton depo.).

Melton also received a letter from the Randolph County Branch of the National Association for the Advancement of Colored People (NAACP), "on behalf of . . . concerned citizens of Roanoke and surrounding area," stating that Farr's post represented "hate speech."   Doc. 26-1 at 2; Doc. 27 at 8.   The NAACP letter

included signatures from more than 35 "undersigned members of the community," and stated that the community members found "such rhetoric inflammatory, racially insensitive, offensive and unprofessional." Doc. 26-1 at 2; *see* Doc. 26-1 at 3–4 (signatures of community members). The NAACP letter also stated that "[i]t ha[d] been reported to [the NAACP] that Mr. Farr has had a history of racist 'hate speech.'" Doc. 26-1 at 2.

On June 2, 2020, Melton placed Farr on administrative leave. Doc. 24 at 7; Doc. 27 at 9; Doc. 23-1 at 6; Doc. 23-9. In the letter notifying Farr that he had been placed on leave, Melton stated that "a complaint ha[d] been filed on [Farr] from the NAACP regarding a Facebook post that [Farr] made regarding the ongoing protests throughout the country." Doc. 23-9.

Melton and Investigator Lorenzo Foster (along with another investigator) investigated Farr's Facebook post, and "gathered the statements." Doc. 23-1 at 17. Melton "hoped" to "put an end to any kind of even appearance that we had racial bias inside [the] police department." Doc. 23-1 at 17; *see* Doc. 24 at 7–8; Doc. 27 at 10. That investigation was completed by June 5, 2020. Doc. 23-1 at 17.

On June 9, 2020, Farr was issued a letter of discipline. Doc. 23-11. The discipline letter stated that Melton had been investigating allegations made against Farr for "Offenses of Abusive Personnel Conduct or Language Toward the Public or Fellow Employees" and "Disgraceful Conduct which reflects unfavorably on the

City as an employer," and that the investigation had shown that these allegations were "well founded."   Doc. 23-11 at 1; Doc. 27 at 12.

The discipline letter listed by name more than 20 "members of the public" who had submitted "statements of witnesses," and who "had taken as abusive and offensive" Farr's "Facebook Post on Social Media."   Doc. 23-11 at 1–2.

The discipline letter stated that "[t]his has resulted from the negative comments that [Farr] made whether intended or not toward members of this community that has caused racial tensions between the police department, The City, and the public."   Doc. 23-11 at 2.

The discipline letter also stated that Farr would be suspended without pay for two weeks, and that he would be demoted from Lieutenant to "the position of Dispatch[er]/Jailer."   Doc. 23-11 at 3.   The letter was signed by the Mayor of Roanoke at that time—Mike Fisher—but stated that Farr's suspension and demotion were made "upon the recommendation of the Chief of Police [i.e., Melton]."   Doc. 23-11 at 3; Doc. 24 at 9; Doc. 27 at 12.

The discipline letter stated further that "there were many members of the Roanoke Police Department that were offended by your [i.e., Farr's] social media post and are hurt by those comments from you."   Doc. 23-11 at 2.

During the summer of 2020, Patterson Hicks decided to run for Mayor of Roanoke because she "didn't like the way Roanoke was going"; Patterson Hicks is

a white female.   Doc. 23-2 at 5 (Patterson Hicks depo.); Doc. 24 at 9.   Patterson

Hicks considered Farr a friend, and she sometimes attended a church where Farr was

the pastor.   Doc. 23-2 at 6; Doc. 24 at 9; Doc. 27 at 13.   Farr married Patterson

Hicks and her husband, and christened her child.   Doc. 23-2 at 6; Doc. 23-3 at 6

(Farr depo.).

Patterson Hicks was aware that members of the community were offended by

Farr's Facebook post, and that members of the community had complained about

Farr's Facebook post being racist.   Doc. 23-2 at 10, 21; Doc. 31 at 2.   Patterson

Hicks also was aware that Farr had been disciplined.   Doc. 23-2 at 21; Doc. 24 at

11; Doc. 27 at 15.

Patterson Hicks did not think that Farr's Facebook post was racist.   Doc. 23-

2 at 10.   Patterson Hicks organized a rally in support of Farr, and started a

"GoFundMe" account for Farr.   Doc. 23-2 at 10; Doc. 23-3 at 30.

Patterson Hicks disagreed with Melton's recommendation to suspend and

demote Farr because she did not think that Farr had done anything wrong.   Doc. 23-

2 at 23.

But Patterson Hicks was not aware that Melton had conducted an internal

investigation to determine whether Farr had created a potentially hostile work

environment in the Roanoke Police Department.   Doc. 23-2 at 13 (Q. "Well, did

[Melton] himself bring [the NAACP letter] to City Hall? Are you aware of the fact

he started an investigation internally?" A. "No."); Doc. 23-2 at 21 (Q. "I want to go back in time when you were just a citizen. Okay? Did you even know they investigated Farr?" A. "No."); Doc. 23-2 at 22 (Q. "When did you first learn that members of the police department were offended by his social media post?" A. "This case." Q. "All right. When did you first know that citizens in the community were offe[nd]ed by the social media post?" A. "The summer of 2020.").

Patterson Hicks won the election, and on November 2, 2020, she was sworn in as the new Mayor of Roanoke.   Doc. 23-1 at 12; Doc. 24 at 9; Doc. 27 at 13.

After Patterson Hicks was sworn in as mayor, she met with Melton on November 3, 2020.   Doc. 23-2 at 17.   During that meeting, Patterson Hicks "let [Melton] know that he would no longer be the Chief of Police."   Doc. 23-2 at 35; Doc. 24 at 10; Doc. 27 at 13.   Patterson Hicks told Melton that she was "appreciative of his years with the City and that he probably would not be reappointed chief."   Doc. 23-2 at 17; Doc. 24 at 10.

Patterson Hicks believed that Melton no longer was qualified to be police chief based on conversations she had with the previous mayor—Fisher—about "[t]he way [Melton] handled . . . Farr and the Facebook post."   Doc. 23-2 at 13.

The Roanoke Personnel Policy states that the City "shall fill job/positions with the most qualified eligible applicants."   Doc. 26-9 at 2; Doc. 27 at 16.   Under that personnel policy, the police chief position is an unclassified employee role, meaning

the "employee's tenure of service is at the pleasure of the Mayor and City Council."
Doc. 26-9 at 7; *see* Doc. 26-9 at 9 ("The Mayor is designated as the individual who
appoints and employ[s] all necessary employees for the municipality; except that
those positions in the unclassified service will be filled by the City's Governing
Body and Mayor."); *see also* Doc. 24 at 6 ("In Roanoke, the Mayor and five City
Councilpersons comprise the appointing authority and make appointments for
positions such as Police Chief.").

After speaking with Patterson Hicks, Melton submitted a "letter of retirement"
that was dated November 3, 2020, and that was addressed to Patterson Hicks and the
City Council.   Doc. 23-8.

Melton's retirement letter stated as follows:   "On November 3rd, the Mayor
[Patterson Hicks] asked me to submit my retirement effective before the November
16th City Council Meeting.   At this meeting the council would be appointing
someone else as police chief and that I was being told in advance so that I wouldn't
be surprised.   I therefore see no other option but to submit my letter of retirement
. . . ."   Doc. 23-8 at 1.

On November 16, 2020, Patterson Hicks and the City Council met for an
organizational meeting.   Patterson Hicks had selected a new police chief—Jonathan
Caldwell—who was nominated based on her recommendation and then appointed.
Doc. 23-12; Doc. 23-1 at 15; Doc. 24 at 10–11; Doc. 27 at 16.

# LEGAL STANDARD

## A.    Summary judgment

Summary judgment is appropriate when the movant establishes that "there is no genuine dispute as to any material fact," and that the movant "is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   A material fact is one that might affect the outcome of the case.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[2]   And a dispute about a material fact is "genuine," if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Id.*

To avoid summary judgment, the nonmovant must go beyond mere allegations to offer specific facts creating a genuine dispute for trial.   *Celotex*, 477 U.S. at 324–25.   The court's responsibility is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   *Anderson*, 477 U.S. at 249.   The court must construe all evidence and draw all reasonable inferences in favor of the nonmovant.   *Centurion Air Cargo,*

---

[2] *Accord, e.g.*, *Celotex*, 477 U.S. at 322–23 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.   In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

*Inc. v. UPS Co.*, 420 F.3d 1146, 1149 (11th Cir. 2005).

Where there is no genuine dispute of material fact for trial, the movant is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a), (c).

**B.     Title VII retaliation—but-for causation, and the decision-maker's actual knowledge of the plaintiff's alleged protected activity**

As noted above, where a plaintiff bases a Title VII retaliation claim on circumstantial evidence, the plaintiff must show causation.   "Even if an employee can establish statutorily protected activity and a materially adverse action, he still must show a causal connection between them."   *Ceus v. City of Tampa*, 803 F. App'x 235, 248 (11th Cir. 2020) (citing *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010)); *Yelling*, 82 F.4th at 1342 ("[A] retaliation plaintiff's 'mosaic' of evidence must still be enough to allow a reasonable jury to infer but-for causation.").

Recently (in October 2023), the Eleventh Circuit twice analyzed and clarified the causation standard for a Title VII retaliation claim.   In *Yelling v. St. Vincent's Health System*, the Eleventh Circuit explained that, "to succeed on [a] retaliation claim, [the plaintiff] must show that her 'protected activity was a but-for cause of the alleged adverse action.'"   82 F.4th at 1338 (quoting *University of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)) (other citation omitted).

That but-for causation standard "asks whether 'a particular outcome would not have happened "but for" the purported cause.'"   *Yelling*, 82 F.4th at 1338

(quoting *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1739 (2020)).   "'Stated another way, a plaintiff must prove that had'" he not engaged in the alleged protected activity "'[he] would not have been fired.'"   *Id.* (quoting *Jefferson*, 891 F.3d at 924).

The Eleventh Circuit in *Yelling* reviewed the Supreme Court's 2020 decision in *Bostock*, and reasoned that "sometimes 'events have multiple but-for causes.'" *Yelling*, 82 F.4th at 1339 (quoting *Bostock*, 140 S. Ct. at 1739–40).   In *Bostock*, the Supreme Court "articulated the longstanding traditional test for but-for causation: 'a but-for test directs us to change one thing at a time and see if the outcome changes.'"   *Id.* (quoting *Bostock*, 140 S. Ct. at 1739).[3]   "If there are multiple but-for causes, the removal of any one would change the outcome."   *Id.*   Each but-for cause "would be a necessary condition for the outcome, regardless of whether there was another such necessary condition.   Each could be viewed as the straw that broke the camel's back."   *Id.* (citations and quotation marks omitted); *see also Nassar*, 570 U.S. at 360 ("Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . .").

A Title VII retaliation claim "requires 'proof that the desire to retaliate was

---

[3] The "but-for test 'directs us to change one thing at a time and see if the outcome changes.'   If it does, the isolated factor is a but-for cause.   And if it does not, the isolated factor is not a but-for cause, and all of the other factors, taken together, are sufficient."   *Lapham v. Walgreen Co.*, 88 F.4th 879, 894 (11th Cir. 2023) (quoting *Bostock*, 140 S. Ct. at 1739, and discussing causation standard for retaliation claims under Family and Medical Leave Act (FMLA) and Florida's Private Sector Whistleblower Act (FWA)).

the but-for cause of the challenged employment action.'"   *Yelling*, 82 F.4th at 1340 (quoting *Nassar*, 570 U.S. at 352).   So, "a plaintiff with evidence of only a tagalong 'forbidden consideration' cannot meet h[is] summary judgment burden because [he] cannot show 'that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'"   *Id.* (quoting *Nassar*, 570 U.S. at 360).

Where a plaintiff alleges that an employer took an alleged "adverse action because of unlawful retaliation and because of other lawful reasons," the plaintiff still has an "obligation to show an *unlawful* but-for cause resulted in the alleged wrongful action."   *Yelling*, 82 F.4th at 1340 (emphasis in original).

And, for sake of clarity, where the evidence shows that "there were two but-for causes—unlawful retaliation and a lawful factor—[the plaintiff] could have a claim if the two combined to result in an adverse action that would not have occurred without that combination."   *Yelling*, 82 F.4th at 1340.   In such a situation, the "retaliation would be a but-for cause because the adverse action would not have occurred without it," and the "fact that a lawful consideration was also a necessary factor would not defeat [the plaintiff's] claim."   *Id.* (citing *Bostock*, 140 S. Ct. at 1739).[4]

---

[4] "Though available for Title VII discrimination claims, it is well-established that the mixed-motive framework does not apply to Title VII retaliation claims." *Yelling*, 82 F.4th at 1338 (citing *Nassar*, 570 U.S. at 360).   The Eleventh Circuit

Likewise, in *Berry v. Crestwood Healthcare LP* (also decided in October 2023), the Eleventh Circuit confirmed:   "Our precedents are consistent with *Bostock*."   84 F.4th 1300, 1308 (11th Cir. 2023) (discussing pretext with respect to a Title VII retaliation claim).   According to the Eleventh Circuit, "*Bostock* explains that 'events [can] have multiple but-for causes.'"   *Id.* (citing *Bostock*, 140 S. Ct. at 1739).   But an "employee[] alleging multiple but-for causes must 'show an *unlawful* but-for cause resulted in the alleged wrongful action.'"   *Id.* (quoting *Yelling*, 82 F.4th at 1340, in a parenthetical).

Moreover, for a Title VII retaliation plaintiff to show causation, the Eleventh Circuit also requires evidence that the decision-maker had actual knowledge of the plaintiff's alleged protected activity.   "In order to establish a causal connection, a plaintiff must show that the decision-maker was aware of the protected activity." *Ceus*, 803 F. App'x 235, 248 (citing *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002))[5]; *accord, e.g.*, *Zarza v. Tallahassee Hous. Auth.*, 686 F. App'x 747, 754 (11th Cir. 2017) ("[W]ithout evidence of [the decision-maker's] actual knowledge" of the alleged protected activity, a retaliation plaintiff's claim

"use[s] the term 'mixed motive' to refer to claims based on the 'motivating-factor' standard applicable in Title VII discrimination claims."   *Id.* at 1338 n.4.

[5] *See Ceus*, 803 F. App'x at 250 (reasoning that the plaintiff "argues that summary judgment would be improper because the [record facts], taken collectively, establish a 'convincing mosaic' of evidence that the decisionmaker intentionally discriminated against him," and that "[t]his argument also fails").

fails); *Stevenson v. City of Sunrise*, No. 20-12530, 2021 U.S. App. LEXIS 30858, at *29 (11th Cir. Oct. 15, 2021) (affirming the district court's dismissal of a Title VII retaliation claim and concluding that "as a matter of law [the plaintiff] did not demonstrate causation," because the plaintiff had "presented no evidence that [the decision-maker] knew [the plaintiff] had complained of discrimination," and because the decision-maker instead had "testified that he did *not* know" of the alleged protected activity (emphasis in original)); *see also Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002) (Title VII "[d]iscrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.  When evaluating a charge of employment discrimination, then, we must focus on the actual knowledge and actions of the decision-maker" (citations and quotation marks omitted)).

## DISCUSSION

Based on the controlling law, and the undisputed record evidence (construed in Melton's favor), there is no genuine dispute of material fact for trial with respect to causation on Melton's Title VII retaliation claim.  There is no direct evidence based on which a jury reasonably could find retaliation or a causal connection. And, with respect to the circumstantial evidence, even if Melton can show protected activity and an adverse action, there is no evidence based on which a reasonable jury could infer that his alleged "protected activity was a but-for cause of the alleged

adverse action."  *Yelling*, 82 F.4th at 1338 (quotation marks omitted); *see id.* at 1342 (but-for causation on convincing mosaic approach).

As a preliminary matter, Melton's theory of the case—under the opposition clause, *see supra* Legal background—is that Patterson Hicks retaliated against him because of his "opposition to Farr's racist Facebook post and [Melton's] actions to address the resulting hostile work environment" in the Roanoke Police Department. *See, e.g.*, Doc. 27 at 17.  According to Melton, his "investigation of Farr's racist Facebook post and his discipline of Farr for that post . . . constitute[d] protected activity."  Doc. 27 at 17.

Practically speaking, the problem is that there is no evidence from which a reasonable jury could find or infer that Patterson Hicks ever even knew that Melton had conducted an internal investigation to determine whether Farr had created a potentially hostile work environment in the police department, until *after* she already had selected a new police chief to replace Melton in November 2020. Consequently, no jury reasonably could find but-for causation—i.e., that Patterson Hicks retaliated against Melton because of his internal investigation into and opposition to a potentially hostile work environment in the police department. Stated otherwise (on the plain language of the statute), no jury could find that Patterson Hicks retaliated against Melton "because [Melton] ha[d] opposed any practice made an unlawful employment practice."  42 U.S.C. § 2000e-3(a).

*First*, there is no direct evidence based on which a jury reasonably could find retaliation or a causal connection. According to Melton, Patterson Hicks' deposition testimony—that she did not recommend Melton for reappointment as police chief because of "[t]he way [Melton] handled . . . Farr and the Facebook post," Doc. 23-2 at 13—constitutes direct evidence of retaliation and of a causal connection between Melton's alleged protected activity and the alleged adverse action. *See* Doc. 27 at 33–34. But, even "if believed," that deposition testimony does not prove discriminatory or retaliatory intent "without inference or presumption." *Jefferson*, 891 F.3d at 921.

As explained above, Melton's retaliation claim is based on the opposition clause, which prohibits an employer from retaliating against an employee "because [the employee] has opposed any practice made an unlawful employment practice." 42 U.S.C. § 2000e-3(a).

In this regard, Patterson Hicks' deposition testimony cannot constitute direct evidence because, without more (i.e., without some inference or presumption), no reasonable jury could find that Farr's Facebook post was an unlawful employment practice, or that "[t]he way [Melton] handled . . . Farr and the Facebook post" (Doc. 23-2 at 13) "opposed any practice made an unlawful employment practice" (42 U.S.C. § 2000e-3(a)).

As the Eleventh Circuit has said, "not every uncalled for, ugly, racist

statement by a co-worker is an unlawful employment practice," particularly where the relevant "incident occurred away from work." *Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008).

Among other things, there is no evidence that Farr's Facebook post was directed at Melton or any other member of the police department.  So, without more, any opposition to Farr's Facebook post could "not constitute opposition to an unlawful employment practice as a matter of law," and Patterson Hicks' deposition testimony cannot constitute direct evidence because "[t]he opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual." *See Little v. United Techs.*, 103 F.3d 956, 959–60 (11th Cir. 1997).  A "racially derogatory remark by a co-worker, without more, does not constitute an unlawful employment practice under the opposition clause." *Id.* at 961.

*Second*, there is no circumstantial evidence based on which a reasonable jury could infer but-for causation.  In this regard, the court has "look[ed] beyond the prima facie case to consider all relevant evidence in the record to decide the ultimate question of intentional discrimination [i.e., retaliation]." *Tynes*, 88 F.4th at 947.

Again (as explained above, *see supra* Legal Standard, B), the Eleventh Circuit repeatedly has recognized in the retaliation context that, "[a] decision maker cannot have been motivated to retaliate by something unknown to him." *Brungart v.*

*BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).[6]

Patterson Hicks' undisputed deposition testimony is unequivocal:   Before she selected a new police chief (Caldwell) to replace Melton, Patterson Hicks did not know that Melton had conducted an internal investigation into a potentially hostile work environment in the police department; in fact, she did not know until this case was filed.   Doc. 23-2 at 20–21 (Q. "Okay. Now, there was an investigation into Derek Farr started by Adam Melton. Did you have any involvement in that at all?" A. "No." Q. "Did you review the investigation in any way?" A. "I remember getting documents up for the case, but --" Q. "No, no. You are talking about for this case?" A. "Uh-huh." Q. "I want to go back in time when you were just a citizen. Okay? Did you even know they investigated Farr?" A. "No."); Doc. 23-2 at 13 (Q. "Are you aware of the fact he started an investigation internally?" A. "I am not.").[7]

Likewise, Patterson Hicks' undisputed deposition testimony is unequivocal

---

[6] "Though *Brungart* concerns retaliation under the [FMLA]," the Eleventh Circuit "has noted that FMLA and Title VII retaliation are analyzed under the same standards."   *Zarza*, 686 F. App'x at 754 n.5.

[7] Doc. 23-2 at 13 (Q. "What did you understand he [i.e., Mike Fisher, the prior mayor] was trying to tell you that [Melton] should have done that he didn't do?" A. "That [Melton] brought it to him, that he should have handled everything internally instead of it coming to City Hall, the complaint." Q. "Okay. Who brought the complaint to City Hall?" A. "I don't know." Q. "Are you aware that the NAACP brought a complaint to City Hall and started a whole mess for lack of a better word?" A. "I didn't know they brought it to City Hall or to the police department." Q. "Well, did [Melton] himself bring it to City Hall? Are you aware of the fact he started an investigation internally?" A. "I am not.").

that she did not know that any "members of the police department were offended" by Farr's Facebook post, much less about any potentially hostile work environment in the police department, until this case was filed.   Doc. 23-2 at 22 (Q. "At some point, did you become aware of that, that in addition to the citizens of the community, the members of the police department -- some members of the police department were offended by the social media post? Did you become aware of that?" A. "No." Q. "Is now the first time you have realized that I have shown this [i.e., the June 9, 2020 discipline letter issued to Farr] to you?" A. "Oh, I thought you were talking -- yes, I [have] seen this and I was aware." Q. "And when you became mayor, did you learn about all of this in November of 2020?" A. "No." Q. "When did you first learn that members of the police department were offended by his social media post?" A. "This case.").

The only record evidence is that Patterson Hicks did not know about the NAACP letter until this case was filed, and did not know about the June 9, 2020 discipline letter issued to Farr until this case was filed.   Doc. 23-2 at 21 (Q. "Were you familiar with the NAACP letter that was sent in concerning their position on what he [i.e., Farr] had posted back in 2020?" A. "No."); Doc. 23-2 at 21–22 (testimony regarding discipline letter, quoted above).

In addition, until this case was filed, Patterson Hicks did not know about any of the facts that form the basis of the alleged potentially hostile work environment

in the police department that Melton allegedly opposed.  For instance, Patterson Hicks did not know about Johnnie Henderson's complaint regarding Farr's Facebook post.  *See* Doc. 27 at 10, 28.[8]  Patterson Hicks did not know about Yolanda Watkins' EEOC charge.  Doc. 27 at 10, 28.[9]  And Patterson Hicks did not know that Lorenzo Foster had overheard Farr saying the n-word; Foster never reported it.  Doc. 27 at 10, 28; *see* Doc. 23-5 at 32 (Foster depo.).

Furthermore, the undisputed record evidence is that Patterson Hicks was the decision-maker in selecting Caldwell to replace Melton as police chief.  The minutes for the November 16, 2020 meeting of the Mayor and City Council show that Patterson Hicks "read the retirement letter of Adam Melton."  Doc. 23-12 at 1. After a motion to appoint Caldwell was made and seconded, "Council member [John Frank] Houston asked if this appointment is seniority or do you [i.e., Patterson Hicks] just hire who you want."  Doc. 23-12 at 2.  "Mayor [Patterson Hicks]

---

[8] Doc. 23-2 at 26 (Q. "Well, [Henderson] says, 'I filed a verbal complaint in October 2020 with Chief of Police Adam Melton regarding a racially discriminatory social media post made by one of the department's white officer[s].' Were you aware of that?" . . . A. "No." Q. "You never knew about this?" A. "Prior to this, no.").

[9] Doc. 23-2 at 26 (Q. "Any other EEOC charges filed against the City in any department?" A. "Since I have been mayor?" Q. "Yes." A. "No." Q. "How about before you were mayor?" A. "Yes." Q. "Who filed charges?" A. "Yolanda Watkins." Q. "Who else?" A. "Nobody else that I know of." Q. "Have you seen Watkins' [complaint]?" A. "I have not seen it, no. The attorney asked for it yesterday and we got it for him. I don't know what it said." Q. "Were you mayor when it was filed?" A. "No." Q. "Did you find it?" A. "Yes." Q. "Did you read it?" A. "I didn't." Q. "Who was mayor when that charge was filed?" A. "Mike Fisher.").

advised appointments are not based on seniority but on her selection for appointment." Doc. 23-12 at 2; *see also* Doc. 26-9 at 9 (police chief position "will be filled by the City's Governing Body and Mayor" under the City's personnel policy).

Council member Mike Parmer testified in his deposition that under the City's personnel policy "the Mayor recommends and the Council appoints" the police chief, and that Caldwell was appointed because Patterson Hicks had "recommended one name." Doc. 23-6 at 18 (Parmer depo.).[10]

In her deposition, Patterson Hicks testified, "I didn't ask for [Melton's] resignation"; instead, she told him he would not be reappointed as police chief. Doc. 23-2 at 16 (Q. "What did you ask for? Did you tell him he's not get[ting]

---

[10] Doc. 23-6 at 17–19 (Q. "So what happens, a name comes forward -- you have got one name and some[one] says, okay, I nominate this name --" A. "Yes." Q. "-- whoever the name is to move things along?" A. "A second and then a vote." Q. "And that's it; right?" A. "Yes." Q. "Okay. So the only name there was -- you need a chief; right?" A. "Yes." Q. "The only name put forth was --" A. "Caldwell." Q. "Only Caldwell's name. Was the Mayor the person that recommends to the Council the name?" A. "I mean, I brought it up. I was the one that made the nomination should I say." Q. "How was his name the name in front of you?" A. "He come recommended." Q. "By the Mayor?" A. "Yes." Q. "I've read the policy. The way it works, the Mayor recommends and the Council appoints?" A. "Yes." Q. "Okay. So Mayor recommended one name and that was --" A. "Yes." Q."-- Caldwell?" A. "Caldwell." Q. "And y'all need a chief --" A. "Yes." Q. "-- and so here is the name, let's move things along you say, okay, I vote to nominate Caldwell --" A. "Yes." Q. "-- somebody seconded it --" A. "And it went to a vote." Q. "-- went to a vote, and he gets nominated?" A. "Yes." Q. "And that's the end of it; right, your involvement?" A. "Yes.").

reappointed as chief?" A. "Yes." Q. "When you told him he wasn't getting reappointed as chief was [that] because you didn't recommend him, you were not going to recommend him as chief; right?" A. "Right." Q. "You were going to recommend somebody else; right?" A. "Right." Q. "And so his chief job was over?" A. "Right." Q. "And at that point, he had no job?" A. "He could have asked for an open position that was at the police department.").[11]

Likewise, Melton asserts that "Mayor Patterson [Hicks] selected [Melton's] replacement" as police chief (Doc. 27 at 15 (subheading emphasis omitted)), and that under the City's personnel policy "the mayor recommends the person and the council appoints the person according to the Mayor's recommendation" (Doc. 27 at 16).

Melton's November 3, 2020 retirement letter also stated that Patterson Hicks had "asked [him] to submit [his] retirement," that "the council would be appointing

---

[11] *Accord* Doc. 23-2 at 17 (Q. "Do you remember telling [Melton] you would take his retirement that day and his retirement had to be effective before November 16th?" A. "That's not what I said." Q. "Okay. What did you say?" A. "I told him that I was appreciative of his years with the City and that he probably would not be reappointed chief, and I was going to let him decide what he wanted to do." Q. "Well, you weren't going to recommend him. If you didn't recommend him he wouldn't be reappointed; right?" A. "Yes."); Doc. 23-2 at 27–28 ("Once you became mayor, you let Mr. Melton know you were not going to recommend him to in the Council to be chief; correct?" A. "Yes." Q. "And therefore his time as chief was over; correct?" A. "Yes." Q. "And that's how it works, to be the chief, you have to recommend the person to be chief; right?" A. "It's a vote." Q. "You have to recommend them to get them to vote on it; right?" A. "Right." Q. "And so you didn't recommend Melton, so he was not going to be chief; correct?" A. "Right." Q. "Am I correct?" A. "Yes.").

someone else as police chief," and that—in light of his meeting with Patterson Hicks—Melton "s[aw] no other option but to submit [his] letter of retirement." Doc. 23-8 at 1.

Given that Patterson Hicks was the decision-maker who decided to select a new police chief to replace Melton, Melton cannot create a jury question based on what any city council member may have known about Melton's internal investigation or a potentially hostile work environment in the police department. Council member Tammi Holley testified in her deposition that she personally spoke with numerous African-American employees in the police department who "didn't feel comfortable being under [Farr] [as] a supervisor" because of his Facebook post. Doc. 23-7 at 7–8 (Holley depo.).   When asked why Patterson Hicks "force[d] [Melton] to resign," Holley responded, "In a sense retaliation, I would say.   I would use the wor[d] retaliation."   Doc. 23-7 at 5.[12]   But there is no evidence that Patterson Hicks knew Holley had discussed an alleged potentially hostile work

---

[12] Doc. 23-7 at 5 (Q. "Who forced him to resign?" A. "The Mayor." Q. "Mayor [Patterson] Hicks?" A. "Yes." Q. "What is your understanding of why she force[d] him to resign?" A. "I don't think she liked the way it was handled with Derek Farr." Q. "Meaning what?" A. "I say demotion, but he wasn't really demoted, I don't think. He kept his title, he kept his money, but she had this thing going -- it was a GoFundMe on Facebook and all these people rallying behind [Farr], and I think they had [a] rally downtown." Q. "Yes, ma'am." A. "She was a big backer, and so I guess it was like -- I don't know, but I'll get your back, something like that." Q. "To Mr. Melton?" A. "Yes." Q. "For?" A. "In a sense retaliation, I would say. I would use the wor[d] retaliation.").

environment with any police department employee, and nothing in Holley's testimony could be used to create a genuine dispute for trial with respect to Patterson Hicks' testimony that she did not know about Melton's internal investigation into an alleged potentially hostile work environment in the police department.

Melton seems to suggest that a jury could discredit Patterson Hicks' testimony that she did not know about Melton's internal investigation into an alleged potentially hostile work environment in the police department. But (again), the Eleventh Circuit repeatedly has required that, "to establish a causal connection," a retaliation plaintiff "must show that the decision-maker was aware of the protected activity." *Ceus*, 803 F. App'x at 248 (citing *Shannon*, 292 F.3d at 716). So, Melton is the party who needs to identify evidence based on which a jury reasonably could find or infer that Patterson Hicks "was aware of the protected activity" (*id.*); and he has not done so.

As explained above, Patterson Hicks' deposition testimony in this respect is undisputed; there is no fact dispute for trial, no evidence to challenge her credibility on this point, and no evidence from which a jury could find or infer that she "was aware of the protected activity" (*id.*). The only evidence is that Patterson Hicks was *not* aware.

Melton also seems to suggest that, even if Patterson Hicks did not know about Melton's internal investigation into an alleged potentially hostile work environment,

28

she should have known.   But that is not the law.   *See, e.g.*, *Walker*, 286 F.3d at 1274 (Title VII "[d]iscrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent" (citations and quotation marks omitted)).

Regardless, there is no evidence based on which a reasonable jury could find or infer that—from Patterson Hicks' perspective, at the time that she selected a new police chief to replace Melton—Melton's investigation into Farr's Facebook post was anything other than a public and/or political community issue.   Melton points to two text messages Patterson Hicks sent to Farr after she was elected mayor:   In the first, which was dated October 28, 2020, Patterson Hicks stated, "I also feel it's not the right time for you [i.e., Farr, to be police chief].   You being chief will cause Roanoke to have a racial war," Doc. 26-6 at 12, 13[13]; and, in the second, which was dated November 9, 2020, she stated, "I haven't changed my mind and I whole heartedly agree you got a raw deal.   There is still legal issues that I was unaware of . . . ," Doc, 26-2 at 17.[14]   But nothing in those text messages provides any fact basis

---

[13] Doc. 23-2 at 9 (Q. "Did you think electing him [Farr] would cause a race war putting him in the chief job?" A. "Potentially, yes." Q. "Why do you think that?" A. "There was just too much controversy with the post." Q. "With the Facebook post that he did?" A. "Yes.").

[14] Doc. 23-2 at 36 (Q. "What are you talking about, a raw deal with what?" A. "I don't remember." Q. "Was it him being demoted and taken out of his job?" A. "Yes." Q. "'There's legal issues that I was unaware of.' What legal issues?" A. "I don't know." Q. "Are you just saying that or --" A. "I don't." Q. "-- were there legal --"

for a reasonable inference that Patterson Hicks knew or should have known that Melton had conducted an internal investigation into an alleged potentially hostile work environment in the police department; that would be jury speculation, particularly in light of Patterson Hicks' undisputed testimony that she did not know. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue . . . ." (emphasis in original)).

For sure, the record evidence shows that, when she selected a new police chief to replace Melton, Patterson Hicks knew that people in the Roanoke community had been offended and upset by Farr's Facebook post.   Doc. 23-2 at 22 (Q. "When did you first learn that members of the police department were offended by his social media post?" A. "This case." Q. "All right. When did you first know that citizens in the community were offe[nd]ed by the social media post?" A. "The summer of 2020.").[15]

---

A. "I don't know." Q. "What had you promised him?" A. "Nothing.").

[15] Patterson Hicks did not review any of the community complaints until after this case was filed.   Doc. 23-2 at 21 ("It was pretty quickly after the post came to light and the community started raising a ruckus; right?" A. "Yes." Q. "In June of 2020, did you review some of the e-mails and statements that came in expressing the outrage of the African-Americans in the community about the post?" A. "No." Q. "Is the first time you reviewed that when this case got started --" A. "Yes." . . . Q. "So you knew he put out this Facebook post and you knew the people in the community were upset with him; right?" A. "Yes.").

The record evidence also shows that, when she selected a new police chief to replace Melton, Patterson Hicks knew that Melton had recommended that Farr be disciplined—i.e., suspended and demoted.   Doc. 23-2 at 23.[16]

But—after she was elected mayor—Patterson Hicks was free to select a new police chief to replace Melton for public reasons, for political reasons, for (vengeful) personal reasons, or for "no reason at all," so long as her decision was "not for a discriminatory [or retaliatory] reason."   *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1325 (11th Cir. 2023) (quoting *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015)) (quotation marks omitted).[17]

In this regard, the undisputed record evidence shows that Patterson Hicks did not think that Farr's Facebook post was racist, did not think that Farr had done anything wrong, and disagreed with Melton's recommendation to suspend and demote Farr.   Doc. 23-2 at 10, 23.

---

[16] *See also* Doc. 23-2 at 15 ("Had Mr. Melton investigated -- set up an investigation for somebody that engaged in what apparently was race discrimination -- making a race-discriminatory Facebook post; right?" A. "What are you asking?" Q. "I'm asking were you aware of the fact that Mr. Melton set up an investigation concerning Mr. Farr's Facebook post to determine whether it was racially an inappropriate Facebook post that would violate City policy?" A. "Yes." Q. "And you were aware of that at the time you did not reappoint him as chief; right?" A. "Yes.").

[17] As the Eleventh Circuit "repeatedly has recognized, 'employers are free to fire their employees for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" *Phillips*, 87 F.4th at 1325 (quoting *Flowers*, 803 F.3d at 1338).

The undisputed record evidence also shows that Patterson Hicks had decided to run for mayor in the summer of 2020, had organized a rally in support of Farr, and had started a "GoFundMe" account for Farr.   Doc. 23-2 at 10; Doc. 23-3 at 30.

The undisputed record evidence shows further that Patterson Hicks considered Farr a friend, and sometimes had attended a church where Farr was the pastor; and Farr had married Patterson Hicks and her husband, and christened her child.   Doc. 23-2 at 6; Doc. 24 at 9; Doc. 27 at 13; Doc. 23-3 at 6.

What the record doesn't show is any basis for a jury reasonably to find or infer that, until this case was filed, Patterson Hicks knew anything about Melton's internal investigation into—or opposition to—an alleged potentially hostile work environment in the police department, or that Melton's recommended discipline of Farr had anything to with any such internal investigation.

"'The critical decision that must be made is whether the plaintiff has create[d] a triable issue concerning the employer's discriminatory [or retaliatory] intent.'" *Phillips*, 87 F.4th at 1325 (quoting *Flowers*, 803 F.3d at 1336).   "'Title VII functions only as a bulwark against unlawful discrimination [and retaliation]; it does not substitute the business judgment of federal courts for any other nondiscriminatory reason.'"   *Id.* (quoting *Flowers*, 803 F.3d at 1330).

In this case, Melton "must prove that had" he not conducted an internal investigation into an alleged potentially hostile work environment in the police

department "[he] would not have been [replaced]" as police chief.   *Yelling*, 82 F.4th at 1338 (citation and quotation marks omitted).   On the undisputed record evidence, Melton cannot do so.   Until this case was filed, Patterson Hicks didn't even know about Melton's internal investigation into an alleged potentially hostile work environment in the police department, let alone that Melton's recommended discipline of Farr had anything to with any such internal investigation.

The Eleventh Circuit's but-for causation standard "asks whether a particular outcome would not have happened but for the purported cause," and instructs the court to "change one thing at a time and see if the outcome changes."   *Yelling*, 82 F.4th at 1338–39 (citation and quotation marks omitted).   Here, changing the one thing—i.e., taking Melton's internal investigation into an alleged potentially hostile work environment in the police department as the "isolated factor," and removing it—shows that all of the evidence and the only reasonable inference is that the outcome would not have changed:   Patterson Hicks still would have selected someone else to replace Melton as police chief, whether for public, political, or personal reasons.   *See Lapham*, 88 F.4th at 894 (reasoning that, if changing the one thing does not change the outcome, "the isolated factor is not a but-for cause, and all of the other factors, taken together, are sufficient").   Thus, Melton's internal investigation cannot be a "necessary condition" to Patterson Hicks' decision to select someone else to replace Melton as police chief, and cannot be "viewed as the straw

that broke the camel's back."  *Yelling*, 82 F.4th at 1339 (citation and quotation marks omitted).

## CONCLUSION

For the reasons stated above, Defendant City of Roanoke's summary judgment motion (Doc. 22) is **GRANTED**.  The court separately will enter final judgment.

**DONE** and **ORDERED** this January 31, 2024.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE